1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **KASSAUNDRA LEE SALYARDS, by and through her Guardian ad Litem, JENNIFER LEE SALYARDS, and JENNIFER LEE SALYARDS, individually,**<br><br>                **Plaintiffs,**<br><br>        **v.**<br><br>**METSO MINERALS TAMPERE OY; METSO MINERALS INDUSTRIES, INC.; METSO MINERALS MINERALS (USA), INC.; and DOE 1 through DOE 10, Inclusive,**<br><br>                **Defendants.** | 1:04-CV-05798 OWW LJO<br><br>ORDER DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. 66) |

### I.   INTRODUCTION

This case concerns the death of Jason Salyards, an employee at Vulcan Materials Company's plant in San Emido, California. Mr. Salyards was killed while performing a maintenance procedure on a piece of rock-crushing machinery, a Nordberg Jaw Crusher C-140 ("Nordberg C-140"). The Nordberg C-140 is manufactured, marketed and distributed by Defendants. Plaintiffs, Jennifer Lee Salyards (decedent's widow) and Kassaundra Lee Salyards (decedent's daughter) filed suit based on diversity jurisdiction,

**1**

alleging (1) wrongful death based on various products liability theories, (2) negligence, (3) and breach of warranty.  Defendants move for partial summary judgment, arguing that they are entitled to judgment on (a) that portion of Plaintiff's wrongful death claim based on failure to warn (a strict liability cause of action) and (b) the breach of warranty claim.  (Doc. 1, filed June 4, 2004.)

## II.  <u>PROCEDURAL HISTORY</u>

The Nordberg Jaw Crusher was manufactured in Finland by Metso Minerals Tampere Oy (MMTO), a Finnish company.  MMTO has a number of subsidiaries, two of which are also named defendants in this case:  Metso Minerals Industries, Inc. (MMII) is a Delaware corporation with its principal place of business in Wisconsin. MMII sells Nordberg crushers in the United States.  Metso Minerals (USA), Inc. (MMUSA) is a separate American subsidiary of MMTO.  MMTO, MMII, MMUSA and ten does are named as defendants in the complaint.

The complaint sets forth the following claims for relief:

- **First Cause of Action**: <u>Wrongful Death</u> based upon products liability theories of manufacturing defect, design defect, and failure to warn.

- **Second Cause of Action**: <u>Negligence</u> in the design, manufacture, selection of component parts, assemby, marketing, leasing, renting, distribution, repair, installation, failure to warn and maintain, and failure to provide proper instruction and equipment for servicing of the crushing plates.

1

2       •   **Third Cause of Action**: <u>Breach of Warranty</u>.

3       •   **Damages requested:** General damages, medical and

4              incidental expenses, funeral burial and incidental

5              expenses, all losses incurred "because of

6              plaintiffs' inabilities to pursue their usual

7              occupations and activities along with loss of

8              financial support," costs of suit, and prejudgment

9              interest.

10     MMTO previously moved to dismiss the complaint for lack of

11 personal jurisdiction.  (Doc. 28, filed Nov. 15, 2004.)  The

12 motion was denied on the ground that MMTO had sufficient contacts

13 with California.  (Doc. 42, filed Feb. 10, 2005.)

14

15                 **III.**   **FACTUAL BACKGROUND**

16     Vulcan Materials Company ("Vulcan") purchased the Nordberg

17 C-140 that allegedly caused Jason Salyard's injuries from MMII's

18 California distributor, Cooley Equipment Corporation ("Cooley"),

19 in April 2000.

20     The Nordberg C-140 crushes rock in a V-shaped crushing

21 cavity (or "jaw").  One side of the jaw is stationary or "fixed";

22 the other side moves in a pinching motion to crush stone or other

23 material.  The moving and fixed sides of the jaw make up two

24 opposing sides of a four-sided cavity.  (The other two opposing

25 sides of the cavity are stationary and are referred to as

26 "cheeks.")  When operating properly, large pieces of rock or

27 other material enter the jaw crusher from above through the

28 cavity.  The jaw periodically closes, crushing the rock into

**3**

smaller pieces, which then fall out the bottom of the cavity onto a discharge conveyer belt

Each side of the v-shaped jaw is lined with a two-piece set of jaw plates (or jaw "dies"), each with an "upper" and a "lower" plate.  These dies must be periodically replaced, as they wear during use.  To be clear, there are four separate jaw die plates which can wear and need to be periodically replaced -- an upper and lower plate on each of the two sides of the v-shaped die.[1] Each jaw die weighs more than 3,000 lbs.  During normal operation, a system of "wedges" holds the jaw dies in place within the crushing cavity.  On the fixed side, the jaw dies sit flush against the frame of the crusher at six degrees from vertical.

###    A.   The Jaw Die Change-Out Procedure as Set Forth in the Manual.

Nordberg's instructions for installation of new plates begins with the removal of the old, worn plates, commencing with the upper jaw die on the fixed side of the jaw.  (*See* Nordberg Instruction Manual, attached to Forney Depo., Ex. C, at § 8.5 (Metso 00071).)  The manual first instructs the reader to "clean the jaw plate lifting points."  "Lifting hooks" provided by Metso fit into the jaw plate lifting points.  The manual then instructs personnel to "[h]old the jaw plate up with a hoist and [the] lifting hooks." (*Id*.)  Next, the manual calls for the removal of the nuts, bolts, and tightening wedges that hold the upper plate

---

[1]    The two "cheeks" are lined with "cheek plates" that also must be periodically replaced

**4**

1    in place.  The manual states in bold face: "**Be careful not to**
2    **drop the jaw die as it may [sic] personal injury and cause damage**
3    **to the crusher**."  (*Id*.)  This procedure is to be repeated for the
4    lower jaw die on the fixed side, followed by the upper then lower
5    dies on the moving side of the jaw.  (*Id*.)

6    Once the old dies have been removed, the manual explains how
7    to install the new dies, again beginning on the fixed side of the
8    crusher. (*Id*. at Metso 00072.)  The manual instructs the reader
9    simply to "replace the lower jaw."  The manual does not mention
10   the hoist and lifting hooks in the context of the re-assembly
11   instructions.  Once the lower die is in place, the middle
12   "tightening wedge" is replaced at the top of the lower die and
13   secured with a bolt and spring assembly.  The instructions direct
14   that the nut holding this bolt and spring assembly is to be
15   screwed in "lightly."  (*Id.*)

16   Next, the manual tells the reader to "replace the upper
17   jaw."  Once the upper jaw is in place (above the lower plate),
18   two wedges are replaced at the top of the upper plate.  These
19   wedges are secured with a bolt and spring assembly as well.  The
20   instructions then state: "make sure there is a clearance of 5-8
21   mm (3/16 - 5/16") between the upper and lower jaw plate and that
22   the tightening wedge (3) has not <u>bottomed out</u>."  It appears that
23   this caution against "bottoming out" is a re-iteration of the
24   instruction that the bolt in the middle wedge should be screwed
25   in "lightly." (If this bolt is screwed in tightly, there is no
26   way to adjust the dies up or down to achieve the required
27   clearance.  Once the desired clearance is achieved, the bolts are
28   tightened according to specifications provided in the

**5**

instructions.[2])   The procedure for replacing the dies on the moving side of the jaw is essentially the same.

   Plaintiffs assert that there is a hidden danger associated with this tightening sequence and that Defendants did not provide sufficient warnings of this danger.

### B.   Cautionary Language in the Manual.

   The jaw die change-out procedure is explained in Section 8.5 of the instruction manual.  The only cautionary warnings contained within this section of the manual are as follows:

- •   During the jaw die change out procedure, "Hold the jaw plate up with a hoist and lifting hooks."  (UMF No. 25.)

- •   During the jaw die change out procedure, "**Be careful not to drop the jaw die as it may [cause] personal injury and cause damage to the crusher.**"  (UMF No. 26 [Bolding in original].)

   Elsewhere in the manual, the following general warnings are included:

_____

   [2]    A box on the page of the manual containing these re-assembly instructions states:

> **Note! The tightening sequence:**
>
> First pretighten the lower bolts and adjust the clearance between the upper and lower jaw plate 5-8 mm (3/16" - 5/16").  Tighten the upper bolts and then lower ones.  If the tightening wedge has bottomed out and there is no clearance, torch cut a piece from the jaw plates.

(Metso 00072.)

- "A copy of this manual must be kept at the equipment's location and made available to the operators as required."  (UMF No. 15.)

- "In addition to this manual and accident prevention regulations mandatory in the country of use and at the equipment's places of operation, generally recognized rules for safe and professional operation must be observed."  (UMF No. 16.)

- "This instruction manual must be read and used by each person who works with the equipment, typically...<u>maintenance</u>, including inspection and repair."  (UMF No. 17 [Underlining in original].)

- The information contained in this manual is not intended to replace safety codes, insurance requirements, federal, state and local laws, rules and regulations."  (UMF No. 18.)

- "Remember that on any job, YOU are the key to safety. Good safety practices not only protect the men around you, they are your own best protection.  Study this manual and any manufacturer's operator's manual covering your specific equipment.  Read all warnings and caution instructions.  Practice safe operation INSIST THAT YOUR FELLOW WORKERS DO, TOO.  BE ALERT TO POSSIBLE HAZARDS BEFORE THEY CAUSE TROUBLE, AND REMEMBER . . .SAFETY IS UP TO YOU!!!"  (UMF No. 19 [Capitalization in original].)

- "DO YOU KNOW YOUR EMPLOYER'S SAFETY PROGRAM? Company safety records show that the greatest percentage of accidents are caused by disregard of simple safety rules.  Know—observe!—the overall program . . . and consult your supervisor when starting a job."  (UMF No. 20 [Capitalization in original].)

- DON'T STOP YOUR SAFETY PROGRAM WITH THESE GENERAL RULES. BE EQUALLY CONSCIOUS THAT SPECIFIC WORKING CONDITIONS AND YOUR PARTICULAR EQUIPMENT CAN REQUIRE ADDITIONAL PRECAUTIONS."  (UMF No. 21 [Capitalization in original].)

- "Use the proper tools; handle tools and heavy parts sensibly."  (UMF No. 22.)

- "Since periodic inspection and maintenance must be performed on each Crusher, IT IS IMPORTANT THAT SOME TYPE OF PLATFORM BE ERECTED AT A LEVEL CONVENIENT FOR THE MAINTENANCE MEN WHO MUST INSPECT AND WORK ON THE CRUSHER."  (UMF No. 23 [Capitalization in original].)

- "During replacement of parts or heavy structural components careful handling and hoisting procedures must be followed to eliminate any possible danger." (UMF No. 24.)

7

**C.   Vulcan's Handling/Use of the Instruction Manual.**

The instruction manual was not kept alongside the jaw crusher, but was stored in an office behind the desk of Mr. Cliff Warden, who served as the production foreman at the San Emidio plant at the time of the accident. (UMF No. 27; Warden Depo. at 14.)  Mr. Warden reviewed the manual himself when it arrived in 2000, but admits that he did not review the manual at any other time before the accident.  Warden also acknowledges that he was not responsible for safety oversight.  (Warden Depo. at 21-23.) Warden does not recall whether Mr. Salyards ever reviewed the manual.  (*Id.* at 22-23.)

Three Vulcan employees ordinarily performed the change-out procedure with Mr. Salyards:  Jason Morris, Frank Buffuna, and Jonathan Latham.  (UMF No. 28.)  Neither Morris nor Buffuna had ever seen or read the instruction manual prior to the accident. (*Id.*)  The parties dispute whether Jonathan Latham read the manual prior to the incident.

In addition, neither Frank Parra, the San Emidio Plant Manager, nor Biagio Ventura, the Vulcan Safety and Health Representative in charge of the San Emidio Plant, ever saw the C-140 Instruction Manual prior to the accident.  (UMF No. 29.)

**D.   MMII's supplemental training.**

Defendants held training seminars on the Nordberg C series of crushers.  At these seminars, trainers employed by Defendants explained the jaw die change out procedure and described how to block jaw dies during the process.  (UMF No. 30.)  Metso sent

**8**

notice of these seminars to Vulcan personnel.  Although other Vulcan plants sent employees to these seminars, no one from the San Emido plant attended.  (*Id*.)   However, prior to Vulcan obtaining the Nordberg C-140, Henry Gaffron, another Vulcan employee, trained Mr. Salyards on how to change out jaw dies on a different jaw crusher at the San Emidio Plant.  (UMF No. 31.) Mr. Gaffron taught Mr. Salyards to block the jaw dies from moving by welding a length of angle iron between the two sides of the crushing cavity.  (*Id*.)

### E.   **The Accident**.

Mr. Salyards was killed while performing the die change out procedure on June 14, 2003.  (UMF No. 32.)  At that time, the new jaw dies were hoisted into place in the crushing cavity.  (*Id*.) Mr. Salyards attempted to block the jaw die from movement by jamming (not welding) a length of angle iron into the top of the crushing cavity.  (*Id*.)  He then removed the hoisting assembly (provided by Metso) and attempted to replace the top wedge assembly.  (UMF No. 32.)  Mr. Salyards had used this same method of restraining the jaw several times in the past.  (*Id*.)

Mr. Salyards stood at the top of the crushing cavity with his left foot on the top of the "cheek plate" and his right foot extended onto the length of angle iron.  (UMF No. 33.)  At this point, Mr. Salyards was positioned above the discharge conveyor. He was not wearing any fall protection.  As Mr. Salyards attempted to secure the top wedge assembly, the angle iron slipped out from under him.  He fell into the crushing cavity, and the jaw die toppled over into the cavity, killing him.  (UMF No. 34.)

**9**

1

2     **F.    Other pertinent facts**.

3          The contract between MMII and Cooley disclaims all

4    warranties, express or implied, on products sold by MMII to

      Cooley under the contract.  (UMF No. 36.)

5

6

7                    **IV.   STANDARD OF REVIEW**

8    _____      Summary judgment is warranted only "if the pleadings,

9    depositions, answers to interrogatories, and admissions on file,

10   together with the affidavits, if any, show that there is no

11   genuine issue as to any material fact."  Fed. R. Civ. P. 56(c);

12   *California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998).

13   Therefore, to defeat a motion for summary judgment, the non-

14   moving party must show (1) that a genuine factual issue exists

15   and (2) that this factual issue is material.  *Id.*  A genuine

16   issue of fact exists when the non-moving party produces evidence

17   on which a reasonable trier of fact could find in its favor

18   viewing the record as a whole in light of the evidentiary burden

19   the law places on that party.  *See Triton Energy Corp. v. Square

20   D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995); *see also Anderson v.

21   Liberty Lobby, Inc.*, 477 U.S. 242, 252-56 (1986).  The evidence

22   must be viewed in a light most favorable to the nonmoving party.

23   *Indiana Lumbermens Mut. Ins. Co. v. West Oregon Wood Products,

24   Inc.*, 268 F.3d 639, 644 (9th Cir. 2001), *amended by* 2001 WL

25   1490998 (9th Cir. 2001).  Facts are "material" if they "might

26   affect the outcome of the suit under the governing law."

27   *Campbell*, 138 F.3d at 782 (quoting *Liberty Lobby, Inc.*, 477 U.S.

28   at 248).

                              **10**

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).  If the moving party fails to meet this burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  However, if the nonmoving party has the burden of proof at trial, the moving party must only show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party has met its burden of proof, the non-moving party must produce evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. *Triton Energy Corp.*, 68 F.3d at 1221.  The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint. *Devereaux*, 263 F.3d at 1076.

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp.*, 477 U.S. at 322-23.

"In order to show that a genuine issue of material fact exists, the nonmoving party must introduce some 'significant

**11**

probative evidence tending to support the complaint.'"   *Rivera v. AMTRAK*, 331 F.3d 1074, 1078 (9th Cir. 2003) (quoting *Liberty Lobby, Inc.*, 477 U.S. at 249).   If the moving party can meet his burden of production, the non-moving party "must produce evidence in response....[H]e cannot defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements."   *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).   "Conclusory allegations unsupported by factual data cannot defeat summary judgment."   *Rivera*, 331 F.3d at 1078 (citing *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001)).

The more implausible the claim or defense asserted by the nonmoving party, the more persuasive its evidence must be to avoid summary judgment.   *See United States ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir. 1996).   Nevertheless, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor."   *Liberty Lobby, Inc.*, 477 U.S. at 255.   A court's role on summary judgment is not to weigh evidence or resolve issues; rather, it is to find genuine factual issues.   *See Abdul-Jabbar v. G.M. Corp.*, 85 F.3d 407, 410 (9th Cir. 1996).

//
//
//
//
//
//
//

1

## V.  DISCUSSION

2

### A.   Failure to warn claim.

3      To establish a claim of strict liability for failure to
4 warn, a plaintiff must prove that

5              [1] the manufacturer had a duty to warn of the dangers
               arising from a foreseeable use of the product and [2]
6              that the breach of that duty was the proximate cause of
               the plaintiff's injuries. When a manufacturer is or
7              should have been aware that a product is unreasonably
               dangerous absent a warning and such warning is
8              feasible, the manufacturer will be held strictly liable
               if it fails to give an appropriate and conspicuous
9              warning.

10 *Maneely v. General Motors Corp.,* 108 F.3d 1176, 1179 (9th Cir.
11 1997)(applying California law).

12     Defendants move for summary judgment on the failure to warn
13 claim arguing (1) that they had no duty to provide additional
14 warnings in this case and (2) that Plaintiff has failed to
15 present any evidence establishing causation.

16

17          **1.   *Defendants' Duty to Warn.***

18     Defendants may escape liability for failure to warn if the
19 potential dangers posed by the Nordberg C-140 were "open and
20 obvious" ones:

21              Strict liability for failure to warn does not attach if
               the dangerous propensity is either obvious or known to
22              the injured person at the time the product is used.

23 *Gonzales v. Carmenita Ford Truck Sales, Inc.*, 192 Cal. App. 3d
24 1143, 1153 (1987).  Here, Defendants argue that they had no duty
25 to warn in this case because any potential hazards associated
26 with the jaw die change-out were obvious and/or well known to the
27 maintenance staff, including Mr. Salyards.

28

1     First, Defendants argue that there is an obvious risk posed

2 by a 3000 pound slab of metal standing on end. Defendants submit

3 that Mr. Salyards must have been aware of this risk because of

4 the training he received from Mr. Gaffron, who taught Mr.

5 Salyards to weld (rather than simply jam) a length of angle iron

6 between the opposing plates during installation. (UMF No. 31)

7 Defendants suggest that "the fact that [Mr. Salyards] continued

8 to use the angle iron at all... is powerful evidence that he was

9 fully aware of the need to block the jaw die from falling into

10 the crushing cavity." (Doc. 66 at 9.)

11     Plaintiffs respond by pointing to one potential hazard that

12 could create a "trap for the unwary." (Doc. 72 at 5.) After the

13 new upper die is set into place, the instruction manual directs

14 the reader to secure the middle wedge (which holds the bottom of

15 the upper die in place) by initially tightening the nut and bolt

16 assembly <u>lightly</u>. After the position of the upper die is fine-

17 tuned and the upper wedge is bolted into place, the nuts holding

18 the middle wedge may need to be tightened further.

19     According to Defendants' expert, Dr. Fourney, so long as the

20 middle wedge nuts remain loose during the initial phase of the

21 procedure (a situation the parties describe as "leaving the

22 middle wedge in the full outboard position"), the upper jaw die

23 does not pose a particularly great tipping hazard. (Fourney

24 Depo. at 85-86.) However, Dr. Fourney opined that, if the nuts

25 on the middle wedge are tightened too much (moving the wedge

26 toward the inboard position), the dies' center of gravity would

27 change, and the force required to tip the uplifted jaw die would

28 diminish – creating an increasingly hazardous condition. (*Id.* at

**14**

87-89.)  Dr. Fourney thought that the inclusion of a warning
specifically informing the reader of the nature of this hazard
would be too confusing.  (*Id.* at 178.)  However, Dr. Fourney did
admit that he would have "prefer[red]"  it if the manual
contained more detailed instructions to ensure that the reader
only tighten the bolt "lightly."  For example, Dr. Fourney
suggested that it would have been better if the manual stated
"turn [the nut] three complete turns" or "hand tighten."  (*Id.* at
177.)

Under normal circumstances (i.e., if the bolts are left
loose), Plaintiffs maintain that the jaw die would be difficult
to tip in to the crusher.  Under these circumstances, jamming a
piece of angle iron into the cavity (an ad hoc method used by the
workers to satisfy a general industrial safety requirement that
heavy objects be blocked from unintended movement) would probably
be sufficient.  However, given the chance that the nuts could be
over-tightened, Plaintiffs maintain that a more substantial
blocking method is absolutely necessary (e.g., welding the angle
iron into place).  Plaintiffs point out that the crusher manual
contains no warning about this particular hazard or of the
importance of welding a blocking device into place.

Defendants rejoin that the instruction manual for the
Nordberg jaw crusher does warn of the possibility of personal
injury if the jaw is allowed to drop into the crushing cavity
during the change out.  (*See* Metso 00071.)  Defendants also place
great emphasis on the language in the section of the change-out
procedure instructions concerning disassembly, that directs the
reader to "[h]old the jaw plate up with a hoist and lifting

**15**

hooks." (*Id.*)  However, no similar language is contained within the sub-section of the manual concerned with the re-insertion of the new jaw dies.  (Metso 00072.)  Dr. Fourney admitted that it would have been better if the manual provided additional instructions concerning when and under what circumstances to utilize and or remove the hoisting mechanisms.  (Fourney Depo. at 175-76.)

On balance, there is a genuine factual dispute over whether Defendant should have either warned users of the dangers associated with over-tightening the bolts during the initial the change-out procedure or, at the very least, clarified the instructions so as to minimize the chance of this occurring.

Whether a particular set of warnings is adequate under the circumstances is generally a question of fact for the jury.  *See Torrez v. Xomox Corp.*, 49 Cal. App. 4th 1, 22 (1996).  The existence of disputed facts over the prominence and sufficiency of any warnings precludes summary judgment on the failure to warn claim.  Viewing the facts in the light most favorable to the non-moving party, it must be inferred that the warnings were <u>inadequate</u>.

### 2.   *Causation*

Defendants argue in the alternative that summary judgment is appropriate on the failure to warn claim because Plaintiffs have failed to establish a causal link between any alleged failure to warn and Mr. Salyard's death.  "A plaintiff asserting causes of action based on a failure to warn must prove not only that no warning was provided or the warning was inadequate, but also that

**16**

1   the inadequacy or absence of the warning caused the plaintiff's

2   injury." *Motus v. Pfizer*, Inc., 196 F. Supp. 2d 984, 991 (C.D.

3   Cal. 2001) (applying California law).  To establish such

4   causation under California law, Plaintiffs must prove that the

5   "alleged failure to warn or inadequate warning was a substantial

6   factor" in bringing about Mr. Salyard's death. *Id*. (citing

7   *Rutherford v. Owens-Illinois*, Inc., 16 Cal. 4th 953, 968 (1997)).

8       Defendants assert that Plaintiffs cannot establish causation

9   in this case because none of the Vulcan employees responsible for

10  changing out the jaw dies ever read the instruction manual.  In

11  other words, Defendants maintain that the absence of any

12  particular warning could not have been a "substantial factor" in

13  Mr. Salyard's death because no amount of additional warnings

14  would have altered Mr. Salyard's conduct.

15      It appears to be undisputed that Nordberg C-140 manual was

16  kept behind Mr. Warden's desk in the Vulcan site office and that

17  neither the plant manager nor the safety and health

18  representative in charge of the San Emido Plant had ever seen the

19  instruction manual.  It is also undisputed that neither Jason

20  Morris nor Frank Buffuna -- the two men working with Mr. Salyards

21  during the change-out procedure on the date of the accident --

22  had ever seen or read the instruction manual prior to the

23  accident.  (UMF No. 28.)  There is some dispute, however, over

24  whether a third maintenance worker, Jonathan Latham, read the

25  manual prior to the incident.  This dispute arises from ambiguous

26  comments Mr. Latham made during his deposition.  Mr. Latham

27  stated that he did review the instruction manual approximately

28  one year prior to the incident, for the specific purpose of

**17**

learning "the specifications for the pinch-down measurement on the spring" (referring to a part of one of the spring and bolt assemblies that hold the jaw wedges in place). (Latham Depo. at 30.)   However, Latham also testified that he did not review the instruction manual prior to the incident for the purposes of learning how to perform the change out procedure. *(Id.* at 30-31.)   Plaintiffs use this portion of Mr. Latham's deposition to argue that "the Vulcan employee who needed to read the Instruction Manual before the initial changeout did so." (Doc. 72 at 2.)   The testimony does not show that Mr. did anything other than look up the spring specifications, which are indicated in a detail on Figure 8.5.1 in Section 8.5 of the manual. Whether the manual should have included a more prominent warning directing the reader's attention to potential fatal risksin the change-out procedure remains an open question.

However, it is also undisputed that Mr. Warden did read the manual when it first arrived at the San Emido plant.   Drawing inferences in favor of the non-moving party, the warnings provided to Vulcan and read by Mr. Warden were <u>inadequate</u>. Although neither party discusses this fact or its potential legal significance, there is some authority that indirectly suggests summary judgment is inappropriate where inadequate warnings were provided to and read by an injured person's employer.

Mr. Warden's role is potentially legally significant.   In general, a manufacturer has a duty to warn the end user if a product poses particular non-obvious hazards.   Under certain circumstances, however, a manufacturer may discharge its duty to directly warn end users by providing a proper warning to an

**18**

1  intermediary.  For example, a prescription drug manufacturer may

2  usually discharge its duty to warn by providing warnings to the

3  prescribing physician, a so-called "learned intermediary."  If

4  the doctor fails to read or heed the warning, the manufacturer is

5  absolved of liability.  In *Motus*, 358 F.3d at 661, one of the

6  cases relied upon by Defendants, causation was found lacking

7  because the prescribing doctor admitted that he failed to read a

8  drug's warning label.  In contrast, where there is no

9  intermediary at all, the end user is held responsible for his or

10 her failure to read warning labels.  In *Ramirez v. Plough, Inc.*,

11 6 Cal. 4th 539, 556 (1993), another case cited by Defendants,

12 causation was disproved where Plaintiff's mother admitted she

13 failed to read the warning label on an over-the-counter

14 medicine.[3]  *See also* Rest. 2d Torts § 388, comment n.[4]

15     This case is distinguishable from both *Motus* and *Ramirez*.

16 Unlike the warnings in those cases, here, the warning in the

17 instruction manual is inferred to be <u>inadequate</u> under summary

18 judgment rules.  It is impossible (and improper) for the court to

19 speculate what steps Mr. Warden might have taken to improve

20

21     [3]    Although it appears that no California court has
22 applied the intermediary principle to an employer, other courts
   have done so.  *See, e.g., Washington v. Dept. of Transp.*, 8 F.3d
22 296, 301, (5th Cir. 1993)(manufacturer owed no separate duty to
23 warn employee where it issued adequate warning to employee's
   supervisor, who failed to relay the information); *Adams v. Union
24 Carbide Corp.*, 737 F.2d 1453, 1456-58 (6th Cir.
   1984)(manufacturer reasonably relied on sophisticated employer to
25 warn its employees).

26
       [4]    The Restatement Second of Torts has often been relied
27 upon by California courts in products liability cases.  *See e.g.,
   Stevens v. Parke, Davis & Co.*, 9 Cal. 3d 51, 64-65 (1973);
28 *Persons v. Salomon N. Am., Inc.*, 217 Cal. App. 3d 168, 175
   (1990).

**19**

safety if a different set of warnings had been included in the manual.

Defendants motion for summary judgment on the failure to warn claim is **DENIED.**

### B.   Breach of Warranty

Plaintiffs allege that Defendants breached express and implied warranties associated with the Nordberg C-140.  A defendant can exclude express and implied warranties if the disclaimer is conspicuous.  *See* Cal. Com. Code § 2316. Defendants assert that Plaintiffs' breach of warranty claims should be dismissed because the contract between MMII (Nordberg's sales subsidiary) and its distributor (Cooley) expressly disclaims any express or implied warranty.  The agreement between MMII and Cooley provides:

> Distributor agrees that it has no authority to and shall not at any time extend any warranty, make any representation or extend to any customer any right or remedy not expressly provided for in the Nordberg published warranties.  Any additional representations made or obligations assumed by Distributor in excess of Nordberg's published warranties shall be solely the responsibility of the Distributor.

> DISTRIBUTOR AGREES THAT THE WARRANTIES AND REMEDIES SET FORTH IN NORDBERG'S PUBLISHED WARRANTIES ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES AND REMEDIES WHATSOEVER, EXPRESS, IMPLIED, OR STATUTORY, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OR MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WHICH NORDBERG EXPRESSLY DISCLAIMS.

(UMF No. 40.)

Plaintiffs contend that these disclaimers do not operate against Vulcan or Plaintiffs because the disclaimers are contained within the contract between MMII and its distributor, not within any contract signed by Vulcan.  Plaintiffs emphasize the requirement than any warranty disclaimer be "conspicuous."

Cal. Com. Code § 2316(2).  According to California Commercial Code § 1201(10), a "term or clause is conspicuous when it is so written that a reasonable person <u>against whom it is to operate</u> ought to have noticed it."

The purpose underlying section 2316 suggests that disclaimers must be included in the contract for sale to the end user.  Section 2316 "seeks to protect a buyer from unexpected and unbargained language of disclaimer by...permitting the exclusion of implied warranties only by conspicuous language or other circumstances which protect the buyer from surprise." *Appalachian Ins. Co. v. McDonnell Douglas Corp.*, 214 Cal. App. 3d 1, 34-35 (1989)(requiring a plaintiff to show that the warranty formed a "part of the basis of the bargain.").

Here, there is no evidence that the disclaimers were included in any contract entered into by Vulcan.  Accordingly, Defendants' motion for partial summary judgment on the warranty claims must be **DENIED.**

## VI.   CONCLUSION

For the reasons set forth above, Defendants' motion for partial summary judgment on the failure to warn and warranty claims is DENIED.

**SO ORDERED**

**Dated: November 10, 2005**

**_/s/ OLIVER W. WANGER_____**
**OLIVER W. WANGER**
**United States District Judge**